UMBERG ZIPSER LLP
Mark A. Finkelstein (SBN 173851)
Brent S. Colasurdo (SBN 281863)
1920 Main Street, Suite 750
Irvine, CA 92614
Telephone: (949) 679-0052
Email: mfinkelstein@umbergzipser.com
Email: bcolasurdo@umbergzipser.com

GLANCY PRONGAY & MURRAY LLP
Peter A. Binkow (SBN 173848)
Jonathan M. Rotter (SBN 234137)
Natalie S. Pang (SBN 305886)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: pbinkow@glancylaw.com
Email: jrotter@glancylaw.com
Email: npang@glancylaw.com

Counsel for Plaintiffs and the Putative Class

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRUSHTI DAVE, ARLENE BERGUM, EMILY DEPOL, KEYA JOHNIGAN, and BRIANNA MCKAY, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>ABBOTT LABORATORIES, ALERE, PROCTER & GAMBLE MANUFACTURING COMPANY, SPD SWISS PRECISION DIAGNOSTICS GMBH, CHURCH & DWIGHT CO., INC., TARGET CORPORATION, and WALGREEN CO.,<br>　　　　　　　Defendants. | Case No.　3:22-cv-5191<br><br>COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE §§ 1750-1785, UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §17200, AND FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500, ET SEQ.<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

{240909.5}

CLASS ACTION COMPLAINT

Plaintiffs Prushti Dave, Arlene Bergum, Emily DePol, Keya Johnigan, and Brianna Mckay (collectively "Plaintiffs"), by and through their undersigned attorneys, bring this class action complaint on behalf of themselves and all others similarly situated as defined below (the "Class"), alleging facts related to their own purchases based on personal knowledge and all other facts based upon the investigation of counsel.

## PRELIMINARY STATEMENT

1.      Defendants Abbott Laboratories ("Abbott"), Alere ("Alere"), Procter & Gamble Manufacturing Company ("Procter & Gamble"), SPD Swiss Precision Diagnostics GmBH ("SPD"), Church & Dwight Co., Inc. ("Church & Dwight"), Target Corporation ("Target"), and Walgreen Co. ("Walgreens") (collectively, "Defendants") produce, market, label and sell various ovulation test kits (the "Ovulation Test Kits" or "Defendants' Kits") in the state of California and throughout the United States.

2.      Millions of people buy and rely upon the Ovulation Test Kits for family planning purposes.  Defendants' Kits are advertised as being able to tell women with 99% or greater accuracy when they will ovulate, and thus when they are the most fertile and most likely to be able to become pregnant.

3.      However, the Ovulation Test Kits do not predict ovulation with 99% or greater accuracy.  The Kits merely test levels of Luteinizing Hormone ("LH"), which may or may not indicate ovulation will occur.  LH is made by a person's pituitary gland and is present in varying levels for people of all genders.  LH levels generally rise quickly just before ovulation in women, but LH levels can spike at varying times in the menstrual cycle for a variety of other reasons unrelated to ovulation.  Defendants' Kits identify when a person has a spike in LH—not when ovulation will occur.

4.      Defendants intentionally mislabel their Kits as ovulation test kits.

{240909.5}

Defendants know that their Kits test LH and not ovulation, but marketing their products as "Luteinizing Hormone Test Kits," which may or may not predict ovulation, would be far less attractive to women seeking to get pregnant. False promises such as these allow Defendants to capitalize on reproductive anxiety and reap massive profits, well in excess of $5,000,000 each year from unwitting consumers.

5.     This action arises out of deceptive and otherwise improper business practices that Defendants engaged in with respect to the packaging of certain ovulation test kits, detailed below, which are packaged in boxes and regularly sold in major supermarkets, grocery stores, convenience stores, and pharmacies throughout the United States, as well as on Amazon and other online retailers.

## JURISDICTION AND VENUE

6.     Diversity subject matter jurisdiction exists over this class action pursuant to the Class Action Fairness Act of 2005, conferring federal jurisdiction over class actions involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. § 1332(d)(2) and (6).

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and Defendants are subject to personal jurisdiction in this district. Defendants marketed and sold the products at issue in this action within this judicial district and do business within this judicial district.

CLASS ACTION COMPLAINT
{240909.5}

# PARTIES

### A.   Plaintiffs

8.     Plaintiff Prushti Dave is a citizen of the state of California and at all relevant times has resided in Alameda County.

9.     Between December 2020 and January 2021, Plaintiff Dave purchased, for her own use, Procter & Gamble's, Abbott's, Alere's, and SPD's (collectively, the "Clearblue Defendants") ovulation test kits marketed and sold under their brand name Clearblue, in Alameda County, California.   Plaintiff Dave reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.   As a result of the Clearblue Defendants' deceptive packaging, Plaintiff Dave was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff Dave expects to continue to purchase ovulation test kits, including the Clearblue Defendants' kits, in the future.

10.     Plaintiff Arlene Bergum is a citizen of the state of California and at all relevant times has resided in San Diego County.

11.     In or about April 2019, Plaintiff Bergum purchased, for her own use, Church & Dwight's ovulation test kits, marketed and sold under its brand name First Response, in San Diego County, California, from a Target retail store.  Plaintiff Bergum reasonably expected that this product would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Church & Dwight's deceptive packaging, Plaintiff Bergum was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff Bergum expects to continue to purchase ovulation test kits, including Church & Dwight's, in the future.

3

CLASS ACTION COMPLAINT

12.     Plaintiff Emily DePol is a citizen of the state of California and at all relevant times has resided in Alameda County.

13.     Between September and December 2020, Plaintiff DePol purchased, for her own use, Target's ovulation test kits, marketed and sold under its trademark up & up, in Sacramento County, California.  Plaintiff DePol reasonably expected that these products would test, with an accuracy of 99%, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Target's deceptive packaging, Plaintiff DePol was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff DePol expects to continue to purchase ovulation test kits, including Target's kits, in the future.

14.     Plaintiff Keya Johnigan is a citizen of the state of California and at all relevant times has resided in Los Angeles County.

15.     In or about March 2021, Plaintiff Johnigan purchased, for her own use, Walgreens's ovulation test kits in Los Angeles County, California.  Plaintiff Johnigan reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-48 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation. As a result of Walgreens's deceptive packaging, Plaintiff Johnigan was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff Johnigan expects to continue to purchase ovulation test kits, including Walgreens' kits, in the future.

16.     Plaintiff Brianna McKay is a citizen of the state of California and at all relevant times has resided in Los Angeles County.

17.     In or about September 2021, Plaintiff McKay purchased, for her own use, Walgreens's ovulation test kits from a Walgreens store in Los Angeles County, California.  Plaintiff McKay reasonably expected that these products would test,

CLASS ACTION COMPLAINT

{240909.5}

with over 99% accuracy, whether she would ovulate in the next 24-48 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Walgreens's deceptive packaging, Plaintiff McKay was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff McKay expects to continue to purchase ovulation test kits, including Walgreens's kits, in the future.

18.     In or about November 2020, Plaintiff McKay purchased, for her own use, Church & Dwight's ovulation test kits, marketed and sold under its brand name First Response, in Los Angeles County, California.  Plaintiff McKay reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Church & Dwight's deceptive packaging, Plaintiff McKay was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff McKay expects to continue to purchase ovulation test kits, including Church & Dwight's kits, in the future.

19.     In or about 2019, Plaintiff McKay purchased, for her own use, the Clearblue Defendants' ovulation test kits marketed and sold under their brand name Clearblue Easy, from a Target location in Los Angeles County, California.  Plaintiff McKay reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of the Clearblue Defendants' deceptive packaging, Plaintiff McKay was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff McKay expects to continue to purchase ovulation test kits, including the Clearblue Defendants' kits, in the future.

20.     In or about 2020-2021, Plaintiff McKay purchased, for her own use,

CLASS ACTION COMPLAINT
{240909.5}

Target's up & up ovulation test kits from a Target location in Los Angeles County, California, and from Target's online store.  Plaintiff McKay reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Target's deceptive packaging, Plaintiff McKay was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff McKay expects to continue to purchase ovulation test kits, including Target's kits, in the future.

**B.**   **Defendants**

21.   Defendant Abbott Laboratories ("Abbott") is an entity organized under the laws of Illinois and is headquartered at 100 Abbott Park Road, Abbott Park, IL 60064.  Defendant Abbott is the parent company and owner of defendant Alere. Alere and Procter & Gamble are co-owners of SPD Swiss Precision Diagnostics GmbH, which owns Clearblue.  Abbott and Alere, through their subsidiaries and related entities, including Procter & Gamble, manufacture, package, advertise, market, distribute, and/or sell ovulation test kit products in the United States using the brand name Clearblue.

22.   Defendant Procter & Gamble Manufacturing Company ("Procter & Gamble") is an entity organized under the laws of Ohio and is headquartered at One Procter & Gamble Plaza, Cincinnati, Ohio 45202.  Defendants Procter & Gamble and Alere are co-owners of SPD Swiss Precision Diagnostics GmBH, which owns Clearblue.   Procter & Gamble, through its subsidiaries and related entities, including Abbott and Alere, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using the brand name Clearblue.

23.   Defendant SPD Swiss Precision Diagnostics GmBH ("SPD") is an entity organized under the laws of Switzerland and is headquartered at 47 route de

CLASS ACTION COMPLAINT

{240909.5}

Saint Georges, 1213 Petit-Lancy, Geneva, Switzerland.  SPD is co-owned by Procter & Gamble and Alere.  SPD, through its subsidiaries and related entities, including Procter & Gamble, Alere, and Abbott, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using the brand name Clearblue.  Defendants Abbott, Alere, Procter & Gamble and SPD are collectively referred to as the "Clearblue Defendants."

24.     Defendant Church & Dwight Co., Inc. ("Church & Dwight") is an entity organized under the laws of Delaware and is headquartered at 500 Charles Ewing Blvd., Ewing NJ 08628. Church & Dwight, through its subsidiaries and related entities, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using the brand name First Response.

25.     Defendant Target Corporation ("Target") is an entity organized under the laws of Minnesota and is headquartered at 1000 Nicollet Mall, Minneapolis, MN 55403.  Target, through its subsidiaries and related entities, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using its trademark up & up.

26.     Defendant Walgreen Co. ("Walgreens") is an entity organized under the laws of Delaware and is headquartered at 200 Wilmot Road, Deerfield, Illinois 60015.  Walgreens Boots Alliance, Inc. is the parent company and owner of Walgreens, and trades on the public stock market under the ticker "WBA." Walgreens, through its subsidiaries and related entities, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States.

## LEGAL BACKGROUND

27.     California's Legal Remedies Act ("CLRA"), California Civil Code sections 1750-1785, *et seq.*, declares it unlawful for any person to undertake unfair

CLASS ACTION COMPLAINT
{240909.5}

methods of competition and unfair or deceptive acts or practices in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer.

28.     California's Unfair Competition Law ("UCL"), California Business & Professions Code section 17200, *et seq.*, prohibits businesses from engaging in "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" in addition to any act in violation of California Business & Professions Code section 17500, *et seq.*, as alleged below.

29.     The UCL allows for any person to pursue representative claims or relief on behalf of others if the claimant meets the standing requirements of California Business & Professions Code section 17204 and California Code of Civil Procedure section 382.  Cal. Bus. & Prof. Code § 17203.

30.     Plaintiffs have standing under California Business & Professions Code section 17204, which provides that actions for relief pursuant to the UCL shall be prosecuted exclusively in a court of competent jurisdiction by, *inter alia*, any person who has suffered injury in fact and has lost money or property as a result of the unfair competition.

31.     California's False Advertising Law ("FAL"), California Business & Professions Code section 17500, *et seq.*, declares it unlawful for any person to disseminate before the public any statement concerning personal property that the person knows, or through the exercise of reasonable care should know, to be untrue or misleading, with intent to dispose of that property or to induce the public to enter into any obligation relating thereto; or to disseminate such untrue or misleading statements as part of a plan or scheme with the intent not to sell the property as advertised.

32.     Pursuant to California Business & Professions Code section 17535, any person, corporation, firm, partnership, or any other association or organization

that violates the FAL may be enjoined by any court of competent jurisdiction. Actions for injunctive relief under the FAL may be prosecuted by any person who has suffered injury in fact and has lost money or property as a result of a violation of the FAL, and the court may make such orders or judgments which may be necessary to restore to any person in interest any money or property which may have been acquired by means declared to be unlawful by the FAL.

## **FACTUAL ALLEGATIONS**

33. Defendants market and sell kits, which they misleadingly call "ovulation test kits," in rectangular boxes. By indicating that their ovulation test kits have 99% or greater accuracy at testing for and predicting ovulation, Defendants deceive consumers.

34. Since about 1989, Clearblue, which is owned by the Clearblue Defendants and their subsidiaries and related entities, has marketed and sold ovulation test kits ("Clearblue's Kits"). Clearblue proclaims that it developed the world's first one-step ovulation test kit. During the relevant timeframe, the Clearblue Defendants marketed and sold at least five different ovulation test kits: i) Easy Ovulation Kit, ii) Advanced Digital Ovulation Test, iii) Digital Ovulation Predictor Kit, iv) Trying for a Baby Advanced Ovulation Kit, and v) Easy Luteinizing Hormone (LH) Kit. Each of Clearblue's Kits prominently bear the promise "99% Accurate" or "Over 99% Accurate" and are labeled as an "ovulation test" or "ovulation kit." Clearblue's Kits also include such representations as "Identify your 2 Most Fertile Days." For example, below is a photo of one of Clearblue's Kits[1]:

---

[1] This image is representative of Clearblue's packaging at the time that Plaintiffs purchased their Clearblue Kits. Around January 2022, the Clearblue Defendants changed the packaging of their ovulation test kits.

9

CLASS ACTION COMPLAINT



35.     Clearblue's website boasts that "over 20 million women choose to use Clearblue products every year."  Accordingly, the Clearblue Defendants make well in excess of $5,000,00 every year on their fertility-related products, including their ovulation test kits.

36.     Clearblue's Kits are regularly sold across the United States in various pharmacies and major retailers, such as CVS and Walgreens, and online through Amazon and other retailers.

37.     Since about 2011, Church & Dwight has marketed and sold ovulation test kits under the brand name First Response ("First Response's Kits").  During the relevant timeframe, Church & Dwight marketed and sold at least three ovulation

CLASS ACTION COMPLAINT

{240909.5}

test kits under its brand name First Response: i) First Response Ovulation Plus Pregnancy Test, ii) First Response Advanced Digital Ovulation Test, and iii) First Response Easy Read Ovulation Test.  Each of First Response's Kits prominently bear the promise "OVER 99% ACCURATE" and are labeled as an "ovulation test."  First Response's Kits also make such representations as "GET PREGNANT SOONER!" and "PREDICTS YOUR 2 MOST FERTILE DAYS."  For example, below is a photo of one of Church & Dwight's Kits:



38.    Church & Dwight claims that its home pregnancy and ovulation test kits, sold under its brand name First Response, are the number one selling brand in the United States.[2]  Church & Dwight's consumer products marketing efforts are

---

[2] Church & Dwight's Form 10-K filed with the SEC for fiscal year ended December 31, 2020 at p.   6   (https://www.sec.gov/ix?doc=/Archives/edgar/data/313927/000156459021006669/chd-10k_20201231.htm) (last visited on Mar. 30, 2022).

CLASS ACTION COMPLAINT

{240909.5}

focused principally on its 13 "power brands."  Its First Response home pregnancy and ovulation test kits are included in its "power brands."  Church & Dwight's consumer products segment comprises the majority of its revenue; for instance, in 2020, Church & Dwight's consumer products segment comprised about 77% of its consolidated net sales.  Each year Church & Dwight makes well in excess of $5,000,000 in profits from sales of First Response's Kits.

39.    First Response's Kits are regularly sold across the United States in various pharmacies and major retailers, such as CVS and Walgreens, and online through Amazon and other retailers.

40.    Since at least 2009, Defendant Target has marketed and sold ovulation test kits under its trademark up & up ("Target's Kits").  During the relevant timeframe, Target marketed and sold at least two ovulation test kits under the up & up trademark, including the Ovulation + Pregnancy Test Combo Pack and Early Luteinizing Hormone ("LH") Test.  Each of Target's Kits prominently bear the promise "99% accurate" and are labeled as an "ovulation test."  Target's Kits also make representations such as "tells you the best 2 days to conceive."  For example, below is a photo of one of Target's Kits:



CLASS ACTION COMPLAINT

{240909.5}

41.     Target's Kits are regularly sold at Target stores and through Target's website, target.com.  Target owns and operates approximately 2,000 stores in the United States, including 309 stores in California, the most of any state.  Target makes well in excess of $5,000,000 in profits each year from sales of Target's Kits.

42.     Since about 2004, Defendant Walgreens has marketed and sold ovulation test kits ("Walgreens's Kits").  During the relevant timeframe, Walgreens marketed and sold at least four different ovulation test kits: Ovulation + Pregnancy Kit, Digital Ovulation Predictor, Daily Ovulation Predictor, and One Step Ovulation Predictor.  Each of Walgreens's Kits prominently bear the promise "OVER 99% ACCURATE" and are labeled as an "ovulation predictor" or "ovulation test."  For example, below is a photo of one of Walgreens's Kits:



CLASS ACTION COMPLAINT

{240909.5}

43.     Walgreens's Kits are regularly sold at Walgreens stores and through Walgreens's website, walgreens.com.   Walgreens owns and operates over 9,000 stores in the United States, including approximately 586 stores across the state of California.

44.     In the United States, there are approximately 64.5 million women in the age range 15-44.  Just over 21 million of those women are 35-44.  According to the National Center for Health Statistics, the provisional number of births for the United States in 2020 was 3,605,201, down 4% from the number in 2019 (3,747,540).[3]

45.     Over the past few decades, the proportion of women bearing children later in life has increased significantly.  The birth rate for women in the age ranges 30-34, 35-39, and 40-44 has grown steadily since 1990, and the age range with the most births in 2019 was 30-34:



National Vital Statistics Reports, Vol 70, No.2, Births: Final Data for 2019, March 23, 2021 ("2019 Birth Report").

---

[3] *See* NVSS, Vital Statistics Rapid Release, Division of Vital Statistics, National Center for Health Statistics, May 2021, p.2 ("2020 Provisional Birth Report").

46.     A woman's fertility declines as she ages.  Women above the age of 30 are more likely to have trouble getting pregnant:

### Infertility

Percentage of married women 15-49 years of age who are infertile (i.e., who are not surgically sterile, and have had at least 12 consecutive months of unprotected sexual intercourse without becoming pregnant), by parity and age:

|  | 2015-2019 | |
|---|---|---|
|  | 0 births | 1 or more births |
|  | Percent (SE) | |
| Total 15-49 years | 19.4 (1.92) | 6.0 (0.64) |
| 15-29 years | 12.6 (3.01) | 5.1 (1.16) |
| 30-39 years | 22.1 (3.33) | 5.7 (0.88) |
| 40-49 years | 26.8 (4.50) | 6.5 (1.13) |

Source: Special tabulation by NCHS

(https://www.cdc.gov/nchs/nsfg/key_statistics/i-keystat.htm#infertilityservices).

47.     As of 2015, an estimated 7.3 million women had received some form of infertility service:

### Infertility services

|  | 2002[1] Percent, Number | 2006-2010[2] Percent, Number | 2011-2015[3] Percent (SE), Number |
|---|---|---|---|
| Percentage and number of women 15-44 years of age who have ever received any infertility services | 11.9% (7.3 million) | 11.9% (7.4 million) | 12.0% (0.51), 7.3 million |

Percentage of women 15-44 years of age who have ever received infertility services, by type of service:

|  | 2002[1] | 2006-2010[3] | 2011-2015[3] |
|---|---|---|---|
| Advice | 6.1% | 6.5% | 6.3% (0.38) |
| Medical help to prevent miscarriage | 5.5% | 4.9% | 5.4% (0.34) |
| Tests on woman or man | 4.8% | 5.1% | 5.2% (0.36) |
| Ovulation drugs | 3.8% | 4.0% | 4.2% (0.32) |
| Artificial insemination | 1.1% | 1.2% | 1.4% (0.19) |

(https://www.cdc.gov/nchs/nsfg/key_statistics/i.htm#infertilityservices).

48.     Women over 30, who now make up the majority of childbearing women in the United States, are more likely to need fertility assistance, including

CLASS ACTION COMPLAINT
{240909.5}

ovulation testing:

| Percentage of women 15-49 years of age who have ever received any infertility service, by parity and age: | | |
|---|---|---|
| | 2015-2019 | |
| | 0 births | 1 or more births |
| | Percent (SE) | |
| Total 15-49 years | 6.4 (0.53) | 16.6 (0.87) |
| 15-29 years | 2.7 (0.40) | 11.5 (1.49) |
| 30-39 years | 13.6 (1.89) | 15.5 (1.13) |
| 40-49 years | 21.8 (2.89) | 20.0 (1.54) |

Source: Special tabulation by NCHS

(https://www.cdc.gov/nchs/nsfg/key_statistics/i-keystat.htm#infertilityservices).

49. In order to become pregnant, a couple must have intercourse within the window of time approximately between five days before and a few hours after ovulation. The highest probability of conception occurs when a couple has intercourse one or two days prior to ovulation. Therefore, especially for those couples who are having trouble getting pregnant, it is highly beneficial to be able to prospectively predict what day ovulation will occur each cycle.

50. Defendants' Kits detect a rise in urinary LH levels. Over-the-counter LH tests like Defendants' Kits, designed for home use by the consumer, can be useful aids to help predict ovulation. When ovulation takes place, it is generally preceded by a surge in LH levels 24–36 hours beforehand. Other useful methods for timing intercourse include calendaring, measuring cervical mucus, and other hormone tests such as pregnanediol 3-glucuronide. However, neither LH tests nor any of these methods are able to identify, with 99% accuracy, if a woman is, or soon will be, ovulating. Currently the only method to predict ovulation with a high degree of accuracy is a transvaginal ultrasound, an invasive procedure performed in a clinical setting, which allows the doctor to actually view the egg growing and preparing to detach. An LH test, even if it is 99% accurate in identifying LH, merely provides a "hint" at when ovulation will occur. Fever may be an indicator of viral

16

CLASS ACTION COMPLAINT

{240909.5}

infection. But a thermometer, even if it was 99% accurate at indicating body temperature, could not be lawfully marketed as a "99% accurate viral infection test."

51. Defendants' Kits are not 99% accurate at predicting ovulation because the LH surge the tests detect is not always tied to the actual event of ovulation in a given menstrual cycle. LH surges may happen at other times in a woman's cycle. Many variables—including BMI, age, time from contraceptive use, sports activity, and smoking—affect the natural logarithm of urinary LH levels from days 7 to 20 of the cycle. If a test detects a different LH surge, not the surge that precedes actual ovulation, it will falsely predict the timing of ovulation for that cycle. The user of the test will then unknowingly miss the actual ovulation that takes place in that cycle, and the test will provide none of the fertility benefits for which it is marketed.

52. Furthermore, many women do not have regular cycles. LH tests should be conducted at a specific time in the menstrual cycle, usually three to five days prior to expected ovulation. During irregular cycles, LH tests may be negative, falsely indicating that no ovulation occurred in that cycle. The common occurrence of irregular cycles thus further lower the chances that Defendants' Kits will accurately predict ovulation.

53. Many women trying to get pregnant also have variations in their reproductive systems that make an LH surge not predictive of ovulation. For example, more than 10% of menstrual cycles of fertile women exhibit a condition known as "Luteinized Unruptured Follicle Syndrome." When this occurs, there is a normal LH surge and menstruation, but no egg is released. LH surge has also been detected in many women who are infertile.

54. Therefore, a positive LH test does not predict, with 99% accuracy, that a woman will ovulate within the next 24–36 or 24–48 hours, as claimed in Defendants' marketing. While some of Defendants' Kits may have included an

CLASS ACTION COMPLAINT
{240909.5}

asterisk next to "99% ACCURATE," any attempt at a disclaimer was hidden in small text on a different part of the box or on a pamphlet inside the box.  The additional information provided in the small text, such as "*at detecting LH levels," would also not be understandable to a reasonable consumer, and certainly would not override the large, plain message on the front of the box that these were "OVULATION TESTS" with "99% ACCURACY."

55.   As a result of Defendants' misleading and deceptive marketing of "ovulation test kits," Plaintiffs and the Class purchased Defendants' Kits with the expectation that they were testing whether a woman is, or is about to be, ovulating, with an accuracy of 99%.

56.   Plaintiffs and the Class have been damaged by Defendants' misleading and deceptive practices.

## CLASS ACTION ALLEGATIONS

57.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the Class defined as follows:

> All persons who purchased Defendants' Ovulation Test Kits within the state of California for purposes other than resale.
>
> Excluded from the Class are Defendants; the officers, directors or employees of Defendants; any entity in which the Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of Defendants.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

58.   The Class is sufficiently numerous because Defendants' Kits are sold in thousands of stores, both in retail locations and online, and thousands of people have purchased them during the relevant period.  As a result, joinder of all Class members is impractical.

CLASS ACTION COMPLAINT
{240909.5}

59.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

- Whether Defendants labeled, packaged, marketed, advertised, and/or sold products using false, misleading, and/or deceptive packaging and labeling;

- Whether Defendants' actions constitute violations of misbranding laws in California;

- Whether Defendants' actions constitute deceptive and unfair practices and/or violations of consumer protection laws in California;

- Whether Defendants omitted and/or misrepresented material facts in connection with the labeling, packaging, marketing, advertising, and/or selling of Ovulation Test Kits;

- Whether Defendants' labeling, packaging, marketing, advertising, and/or selling of products constituted an unfair, unlawful, or fraudulent practice;

- Whether the members of the Class have sustained damages as a result of Defendants' wrongful conduct;

- Whether Defendants were unjustly enriched;

- The appropriate measure of damages and/or other relief; and

- Whether Defendants should be enjoined from continuing their unlawful practices.

60.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of consumer and class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and has retained counsel experienced in litigation of this nature to represent

CLASS ACTION COMPLAINT

them.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

61.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

62.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Because of the amount of the individual Class members' claims relative to the complexity of the litigation and the financial resources of the Defendants, few, if any, members of the Class would seek legal redress individually for the wrongs complained of here.  Absent a class action, Class members will continue to suffer damages and Defendants' misconduct will proceed without remedy.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## (VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT—CAL. CIV. CODE § 1750, *ET SEQ.*)

63.    The allegations made in all preceding paragraphs are re-alleged and incorporated by reference herein.

64.    Defendants falsely and misleadingly represented their Ovulation Test Kits, in violation of the California CLRA, California Civil Code section 1750, *et seq.,* including, but not limited to, by marketing and advertising their Ovulation Test Kits as "99% ACCURATE," when in fact, Defendants knew, or in the exercise of reasonable care should have known, that the Kits merely test urinary LH levels, which do not predict actual ovulation with anything approaching 99% accuracy.

65.    California Civil Code section 1780(a) allows any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by section 1770 to bring an action against that person to recover or obtain actual damages, injunctive relief, restitution of

{240909.5}

property, punitive damages, and any other relief that the court deems proper.

66.     Pursuant to California Civil Code section 1752, the provisions of the CLRA are not exclusive, and the remedies provided therein are in addition to any other procedures or remedies for any violation or conduct provided for in any other law.

67.     Prior to filing this action, Plaintiffs, on their own behalf and on behalf of the Class, provided the required notice to Defendants in compliance with California Civil Code section 1782(a).  On February 24, 2022, Plaintiff Bergum sent a letter to Church & Dwight via certified mail, and received no response.  On February 24, 2022, Plaintiff McKay sent letters via certified mail to the Clearblue Defendants, Target, Church & Dwight, and Walgreens, to which the defendants did not respond.  On February 24, 2022, Plaintiff DePol sent a letter via certified mail to Target, to which Target did not respond.  On February 24, 2022, Plaintiff Johnigan sent a letter via certified mail to Walgreens, to which Walgreens did not respond.  On February 24, 2022, Plaintiff Dave sent letters via certified mail to the Clearblue Defendants, to which the Clearblue Defendants did not respond.  Accordingly, pursuant to California Civil Code section 1780(a)(3), Plaintiffs, on behalf of themselves and all other members of the Class, seek compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices.

68.     Plaintiffs' CLRA venue declaration is attached to this Complaint as Exhibit A, consistent with California Civil Code section 1780(d).

69.     Defendants are "persons" within the meaning of California Civil Code sections 1761(c) and 1770, and provide "goods or services" within the meaning of California Civil Code sections 1761(b) and 1770.

70.     Plaintiffs and other members of the Class are "consumers," as the term is defined by California Civil Code section 1761(d), because they bought the

{240909.5}

Ovulation Test Kits for personal, family, or household purposes.

71.     Plaintiffs and other members of the Class have engaged in "transactions," as that term is defined by California Civil Code section 1761(e).

72.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

73.     By marketing and selling their Ovulation Test Kits as "99% ACCURATE," among other acts as alleged herein, Defendants violated California Civil Code section 1770(a)(2)-(9) including, but not necessarily limited to, by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model; and advertising goods or services with intent not to sell them as advertised.

74.     As a direct and proximate result of Defendants' violations, Plaintiffs suffered injury in fact because they purchased the Ovulation Test Kits with the reliance that the product was, *inter alia,* 99% accurate, or over 99% accurate, at predicting ovulation.

75.     Plaintiffs seek an order enjoining the acts and practices described above, restitution of property, and any other relief that the Court deems proper.

76.     Plaintiffs additionally seeks damages, restitution, punitive damages, attorneys' fees and costs, and any other relief under section 1780(a) of the CLRA pursuant to Civil Code section 1782(d), due to Defendants' failure to rectify or agree to adequately rectify their violations as detailed above.

{240909.5}

**SECOND CLAIM FOR RELIEF**

**(VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW—CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, ET SEQ.)**

77.     The allegations made in all preceding paragraphs are re-alleged and incorporated by reference herein.

78.     Defendants engaged in unlawful, unfair, and/or fraudulent conduct under the California UCL, California Business & Professions Code section 17200, *et seq.*, including, but not limited to, by marketing and advertising their Ovulation Test Kits as "99% ACCURATE," when in fact, Defendants knew, or in the exercise of reasonable care should have known, that the Kits merely test urinary LH levels, which do not predict actual ovulation with anything approaching 99% accuracy.

79.     Defendants' conduct is unlawful as alleged herein, including, but not limited to, its violation of California's CLRA, FAL, and California Business & Professions Code section 17500, *et seq.*, described more fully in the Third Claim for Relief below.

80.     Defendants' conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs and California consumers.  The harm to Plaintiffs arising from Defendants' conduct outweighs any legitimate benefit derived from the conduct. Defendants' conduct undermines and violates the stated spirit and policies underlying the FAL and other legal regulations as alleged herein.

81.     Defendants' advertising actions and practices with regard to the Ovulation Test Kits constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers. As a direct and proximate result of Defendants' violations, Plaintiffs suffered injury in fact because they purchased Defendants' Kits with the reliance that the products

were "99% ACCURATE."

82.    Plaintiffs seek (a) injunctive relief in the form of an order requiring Defendants to cease the acts of unfair competition alleged herein and to correct their advertising, promotion, and marketing campaigns or reformulate their products in ways that meet consumer expectations; (b) the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5; and (c) interest at the highest rate allowable by law.  Plaintiffs also seek restitution for themselves and the Class.

**THIRD CLAIM FOR RELIEF**

**(VIOLATION OF CALIFORNIA FALSE ADVERTISING**

**LAW—CALIFORNIA BUSINESS & PROFESSIONS CODE**

**§ 17500, ET SEQ.)**

83.    The allegations made in all preceding paragraphs are re-alleged and incorporated by reference herein.

84.    Defendants publicly disseminated untrue or misleading advertising, or intended not to sell the Ovulation Test Kits as advertised, in violation of the California FAL, California Business & Professions Code section 17500, *et seq.*, including, but not limited to, by marketing and advertising their Ovulation Test Kits as "99% ACCURATE," when in fact, Defendants knew, or in the exercise of reasonable care should have known, that the Kits merely test urinary LH levels, which do not predict actual ovulation with anything approaching 99% accuracy.

85.    As a direct and proximate result of Defendants' violations, Plaintiffs suffered injury in fact because they purchased Defendants' Ovulation Test Kits with the reliance that the product was, *inter alia,* 99% accurate, or more than 99% accurate, at predicting ovulation.

86.    Plaintiffs seek (a) injunctive relief in the form of an order requiring Defendants to cease the acts of unfair competition alleged here and to correct their

24

CLASS ACTION COMPLAINT

advertising, promotion, and marketing campaigns or reformulate their products in ways that meet consumer expectations; (b) the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5; and (c) interest at the highest rate allowable by law. Plaintiffs also seek restitution for themselves and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and in favor of the Class and against Defendants, as follows:

A.   Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and name Plaintiffs as representatives of the Class, and further appoint Plaintiffs' attorneys as Class Counsel to represent members of the Class;

B.   Declare that Defendants violated the CLRA, UCL and FAL;

C.   Order an award of injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign or reformulate their products in ways that meet consumer expectations.

D.   Order Defendants to pay restitution to Plaintiffs and the Class;

E.   Award to Plaintiffs and the Class compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

F.   Order Defendants to pay attorneys' fees and litigation costs to Plaintiffs pursuant to California Code of Civil Procedure section 1021.5 and the common-law private-attorney-general doctrine;

G.   Order Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

CLASS ACTION COMPLAINT

{240909.5}

H.     Order such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Respectfully submitted,

DATED: September 12, 2022          UMBERG ZIPSER LLP


By:  _/s/ Mark A. Finkelstein_____
Mark A. Finkelstein
Brent S. Colasurdo

GLANCY PRONGAY & MURRAY LLP
Peter A. Binkow
Jonathan M. Rotter
Natalie S. Pang

Counsel for Plaintiffs and the Putative
Class

CLASS ACTION COMPLAINT
{240909.5}